May it please the Court, Matt Fitzgerald on behalf of Carl Greene. This is the unusual case in which there is not substantial evidence to support the Board's decision below. Mr. Greene is in his seventies and retired. He's a former railroad employee, and today his sole source of income is his benefits from the Railroad Board. Those benefits, each month, are being docked, essentially, as the Board recovers some $7,700 that it overpaid Mr. Greene in earlier years while he was still working. Below, the Board held that Mr. Greene was at fault for this, and that's the first part of the analysis for whether waiver of repayment is warranted. The Board held that Mr. Greene should have reported to it that his income, each year for several years, exceeded the $14,160 limit, above which his benefits were subject to a deduction. The dissent, however, said, Sorry, could you scoot the microphone up a little or yourself closer to the microphone? Sorry. There we go. There we go. Okay. Sorry. The dissent, however, at the Board level said, No reasonable person being presented with the evidence Mr. Greene was presented would have known that they were required to make a revised estimate of earnings with the Board. The dissent was right, and the bottom line here is that this entire time, Mr. Greene thought that everything was being done right, and he thought that there was nothing he needed to do. The way that the regulations define fault, it's all about the standard of reasonable care. So essentially, the question is whether Mr. Greene's belief was reasonable. And it was, for a handful of reasons. It starts with the original application that Mr. Greene filed with the Board for his benefits. As part of that application, he had to sign and certify that he had received and reviewed Board instructional pamphlets, which are, by design, the Board's information that it provides to explain to people how this is supposed to work. When he reviewed those pamphlets, Mr. Greene saw that, provided that he was working at a job that was covered by Social Security, which he knew that he was, each year Social Security would, through tape match, provide his income to the Railroad Board. In those same forms, which, again, are called How Work Affects Your Railroad Benefits, and there's another one called Employee and Spouse Annuities, Events That Must Be Reported, he found a chart that said, and this is under a heading that says Reporting Your Earnings. It's at page 60 of the Joint Appendix. And the chart says, You do not need to report your income to the Board to us unless, and then has six events. Unquestionably, none of those six events applied to Mr. Greene during this period. So based on that, when he presented this to the hearing officer below, the hearing officer admitted, quote, You've read me things that say you don't have to report. So that's the initial thing at the application stage. Then the Board did actually receive Mr. Greene's income each year for three years from the Social Security Administration. It failed to correct his benefits appropriately. So this is not a case where his actual income was hidden from the Board. The hearing officer admitted on this part, this was a, quote, obvious oversight on the part of the Board, and that's for three years in a row. After airing and calculating his benefits, the Board proceeded to send Mr. Greene misleading letters that essentially told him each year that they had received his income and computed his annuity based on that income. So again, he continues to think, Everything is okay. There's nothing that I need to do. That belief, based on all of this information, was fundamentally reasonable. And if there were any concern, any concern beyond all of this information from the Board, Mr. Greene used the Board's online annuity calculator, which showed him, when he put in his information, that he should be receiving several hundred a month more than he was actually getting in benefits. And this wasn't confusing to him. This was what he expected because he knew that he was subject to a deduction. So the information that Mr. Greene received from the Board made sense to him, would have made sense to any reasonable person, and he believed there was nothing he needed to do. Finally, on this point, I'll say, there is no adverse credibility finding in the record in this case. Neither the hearing officer nor anybody else has said that Mr. Greene said or did anything wrong along the way or testified incorrectly in his lengthy hearing with the hearing officer. So in sum, Mr. Greene acted reasonably. He believed there was nothing he needed to do. So after fault, there is the issue of financial hardship, the secondary issue. The way the statute is set up, if Mr. Greene is without fault, he still must show financial hardship or detrimental reliance to waive recovery. The Board below did not rule on this issue, but the dissent did and found it obviously satisfied. This is the unusual case. This is the rare circumstance in which this Court can go ahead and address that issue. Why would we? I mean, if we agree with you on your primary position regarding the Board's action, why wouldn't we remand it to the Board for further determination on the issue of hardship? Sure, Your Honor. And I think that the real part of the reason is this recovery is taking place already. It's happening every month. There is a deduction from his benefits. And so he is particularly aggrieved by this every month that goes by. At the same time, I want to point out that the Board could have said here, please give us a remand. They could have put in their brief, we'd like to do the second issue. We'd like a first shot at that. But at no stage have they ever taken a position on that issue. They have never essentially asked for that relief from this Court. And so I submit it's been recognized that in rare circumstances, this Court can address an issue like that in the first instance. Is there sufficient evidence in the record for us to do that? There is, Your Honor. And the evidence of his finances is between page 197 and 235 of the record. It's the form that he filled out saying all of his incoming and outgoing money and also the backup for that, bank statements, everything that he has. The bottom line is his annuity is in the neighborhood of $1,100 a month. His monthly expenses for he and his wife are in the neighborhood of $1,700 a month. So it's clear that there is hardship in that way. So if there are no further questions, I'd like to reserve the rest of my time. Okay, thank you. Thank you. Let's hear from the Railroad. Good morning, Your Honors, and may it please the Court. My name is Peter Orlowitz on behalf of the United States Railroad Retirement Board. Mr. Green does not dispute that he received benefits in excess of what he was entitled to under the Railroad Retirement Act. This case is about whether those excess benefits must be paid back. The Board determined in its December 5, 2014, decision that Mr. Green did not qualify for waiver of recovery of the overpaid benefits because he was not without fault in causing the overpayment. This decision is supported by substantial evidence, and the Court should uphold the decision of the Board. At its core, this case originated with Mr. Green's application for benefits and his certified statement on pages 64 and 65 of the record that he did not expect to earn more than the annual exempt earnings amount of $14,160 in 2009. The record contains numerous pieces of evidence, including Mr. Green's testimony before the Board's hearings officer, that Mr. Green understood the significance of that annual earnings limit and understood that part of his annuity was subject to work deductions if he earned more than that amount. In signing his application, Mr. Green certified that he understood he was to immediately notify the Board if that expected earnings amount changed. Mr. Green failed to do so. Section 2F1 of the Railroad Retirement Act states that any person in receipt of an annuity subject to deduction under this subsection shall report to the Board the receipt of excess earnings as defined in paragraph 3 of section 203F of the Social Security Act. That's the statutory requirement that's being implemented by the instruction in the application for benefits, which Mr. Green certified that he read when he signed it. The Board was aware of his earnings, weren't they? By June of 2010, yes, Your Honor. Mr. Green had the information of his 2009 earnings months before that, and if he had reported as he was required to at the time that he became aware that his earnings exceeded in 2009, much of this overpayment could have been alleviated. The Board received a report no later than June of 2010. There's a letter in the record at page 136. By the time that letter was issued and by the time the Board became aware of what Mr. Green's earnings for 2009 were, Mr. Green had already incurred $2,000 of overpayment, and if Mr. Green had reported to the Board as soon as he became aware that he made more than what his initial estimate was and he exceeded it by over $4,000 in 2009. What materials that he received told him when he needed to report this? The most important one, of course, is the application itself and where he was asked. Did it speak to when? Yes, Your Honor. What did it say as to when? That he was to immediately notify the Board if his expected earnings amount changed. That's a very clear and simple statement. So are you saying that in the case of an hourly employee, he would have to know, he would have to what, report the first paycheck he received that was in excess? That would be ideal, Your Honor. Mr. Green did testify before the Board that he received a pay stub every two weeks that gave him a running total of what his annual earnings were. So even though his hourly rate may not have changed, he would have had that information to know when he exceeded that amount. Well, you know what concerns me most about your position is that he, this isn't somebody who just stuck his head in the sand. He kept checking to see if the Social Security, whether, he had first gotten instructions, if you're being covered by employment under the Social Security Act, you don't need to do anything. And then he affirmatively checked anyway, even though he knew that his employment was covered by Social Security. He checked to make sure that his annuity was being adjusted for additional wages. So what is a reasonably diligent person supposed to do when he's told that if your other employment is covered by Social Security, you don't have to do anything, and then he double checks just to make sure, and he gets these notices that say your annuity has been adjusted for your wages. What is somebody supposed to do more? Why isn't that reasonable? There are other instructions in the forms that Mr. Green ignored. In particular, on Form RB9, the instruction was if your earnings increased substantially from the year before. And Mr. Green testified before the Board Hearing Officer that a $4,000 increase from what he estimated to what he actually made in 2009, he didn't consider that substantial. The Board Hearings Officer specifically considered that testimony and rejected it. I'm sorry. Go ahead. Didn't the Hearing Officer also say several times that the materials that Mr. Green received say slightly different things in different places and are confusing? Yes, Your Honor. The Board Hearings Officer did say that. So how is – what more – I'll go back to Judge Keenan's question. What more could he have done? If even the Hearing Officer couldn't understand the materials that Mr. Green with a high school education was supposed to understand. The Hearings Officer acknowledged some ambiguity in the forms, but the Hearings Officer decision that was actually rendered, that was incorporated into the final Board decision, found that Mr. Green had a responsibility to report and that he was aware of the materiality of his change in income amount. In particular, Finding 7 of the Hearings Officer's decision states that the overpayment resulted from the appellant's failure to report earnings in excess of what he had originally estimated in December 2008. In the text of the Hearings Officer's decision, even if Mr. Green reasonably believed at the time of application filing that his 2009 earnings would be under that exempt amount, it should have become clear to the appellant at some point in 2009 that his earnings had exceeded that $14,160 estimate that he provided the Board at the time of application filing. And so because he knew that he had estimated – the information he had given the Board was that he was going to make less and then he knew by the end of 2009, if not earlier, that he made more, he had an obligation to correct that initial estimate that he gave when he made the application. But he also knew that his annuity had been adjusted downward for additional wages, did he not? The letter indicated that his annuity had been adjusted upward. The Board had taken into account the new wages but hadn't applied work deductions because the original estimate – we were still working off of the estimate he gave us when he applied, which is in fact what Board Form G77A explicitly told Mr. Green that we would do. The form states, in most cases, we will calculate how much to reduce your annuity because of your earnings based on either the earnings estimate you gave us when you applied for benefits. Right, but I thought the annuity was reduced for additional wages several times throughout the 2009 to 2013 period. There were other work deductions that were applied, but the letters on pages 79, 89, 98 of the record, the annual letters, said that we had incorporated new earnings. And so the Tier 1 component of his annuity was increased because they were including additional Social Security earnings. It was not a reduction based on the text of the letters. And in fact, those letters in particular, because they make no reference to the annual earnings exempt limit or to work deductions from the Tier 1 component, the only work deduction that they indicate is a $66 amount, which has to do with last pre-retirement non-railroad employer, which is applicable no matter how much money you make or what age you are. And that's clearly inconsistent with the amount of deduction that would have been appropriate for the Tier 1 deduction that's at stake here, that's the issue in this case, based on the information that Mr. Green had been given in Form RB9 and in Form G77 that showed that a deduction for earnings over that exempt annual limit would be $1 of reduction for every $2 in earnings, which would have resulted in about a deduction of $2,000 for 2009, which is what the record shows based on his $4,000 excess earnings. So Mr. Green's primary argument in this court is that he believed the Board would adjust his annuity based on the earnings records from Social Security without any direct action on Mr. Green's part. Board regulations at 20 CFR Sections 255.11d3 and d4 specifically address that exact situation. Section d3 states that providing information to another agency, including the Social Security Administration, is not considered providing information to the Board. Section d4 says that errors by the Board do not extinguish fault by the individual. The Board has admitted that we didn't adjust based on the information we received from Social Security. The hearings officer pointed that out. That doesn't change Mr. Green's independent obligation when he became aware that he exceeded the annual exempt earnings amount to tell the Board. What's your position with regard to whether or not we can make the financial hardship or should make a financial hardship determination? If the Court agrees with counsel for Mr. Green. You mean we agree with Mr. Green? Yes, we would ask for remand specifically because of the age of the record. The Board took no position below. We have no decision or no findings by the hearings officer or the Board. The Labor members' dissent did address it, but that's not the decision of the Board, obviously. Given that this record was compiled in 2013, we don't have any evidence as to whether Mr. Green's financial condition is the same as it was in 2013. In that case, we believe remand would be appropriate for development of that part of the record. Let me ask you if this is an oversimplification. This guy says I've got all these documents. I look at them. I'm trying to figure out what I'm supposed to do. I look at this group. It says do this, so I do it. Now you tell me I owe you money, and I don't doubt that, but I did what I thought I was supposed to do. The Board is saying, well, you should have looked at these documents over here. They're different. Is that what this boils down to? I think that's a bit of an oversimplification, Your Honor, but to the extent that Mr. Green looked at certain forms and took them very literally, he is correct that the six criteria that are listed in Board Form G77, none of those exactly applied. This is a little bit of a rare circumstance because we had an individual who incorrectly, although reasonably at the time based on his knowledge, estimated he would make less than the exempt amount, ended up making more than the exempt amount. Form G77 was not necessarily written with that specific scenario in mind, which is why the application, which is the only document out of these three that we're primarily talking about, that's the only document that Mr. Green actually certified and signed, that the information was correct to the best of his knowledge, that he was aware he needed to notify the Board if the summary was incorrect or if there was any erroneous information, and that's the origin of the requirement that he had to report when he realized that that initial estimate was incorrect. And so if you look at Board Form RB9 and Form G77 in that context, on the assumption that the initial information in the application is correct, we don't see these kinds of problems in other cases because that initial estimate is correct and the Board acts on that initial estimate. For instance, if Mr. Green's estimate had been that he would make $18,000 in 2009, the Board would have taken that information at the application stage and applied temporary work deductions from the very beginning to prevent the overpayment with an adjustment later on once the Social Security earnings had been recorded. Because the estimate was for below that amount, that process never triggered properly on the Board's end, and that is our mistake, but that doesn't relieve Mr. Green of the responsibility to provide us with that updated information when he had it. I think we understand your argument. Thank you, Your Honor. Mr. Fitzgerald, you have a few minutes remaining. Thank you, Your Honor. Just a few points briefly. First, on the possible remand for the financial hardship issue, there's two ways to satisfy that under the statute. One is pure financial hardship. The other is if repaying would be against equity and good conscience, and I submit that the record is also full on that issue. It's in the Joint Appendix at page 197 where essentially Mr. Green says, I had some back surgeries in 2012. I had to leave the job. I was working, and I decided not to seek other employment at that time in reliance on the amount of benefits that I was getting and that I thought was right. And so that, even regardless of the fact that the record of his income is three years old of hardship, the equity and good conscience prong is satisfied and has never been questioned. To briefly turn back to fault, Mr. Green got letters each year in the summer, as counsel stated, from the board, and those letters said near the top, quote, the additional earnings are now available for inclusion. The additional earnings outside the railroad industry, which is an obvious reference to the job that he was working and the money that he had made, are now available for inclusion in Tier 1 of your annuity. And then it said Tier 1, and this is at 79, 89, and 98. Then it said Tier 1 and gave an amount, and that was the big amount of his annuity, the one that starts with 1,000. And so it's creating the reasonable impression in him that that deduction is baked into that number that they're telling him. Counsel for the board also has given a handful of regulations and statutes that he says put this obligation on Mr. Green. Absent from that discussion is any sort of statement that the board told Mr. Green about those regulations or statutes. He is entitled to rely on the informational pamphlets that the board has created for the purpose of explaining this to him. And while we're in the regulations, I will point out that 20 CFR 255.11E1, in the examples of when a person is not at fault, it says, quote, the overpayment is the result of a board error, which is admitted here, of which the overpaid individual was not aware and could not reasonably have been expected to be aware. And I submit that that regulation captures the facts of this case better than any other. Finally, just one last point. There's been some discussion on about page 65 of the record, which is his original form that he signed that says notify the board if expected earnings amount changes. He testified at page 247 of the record that that was hard for him. It wasn't a good fit for his job because from week to week, he didn't know whether he would have any income, work regular shifts, or work overtime. And so there's no obvious moment when he could have called the board and said, I want to change my expected earnings amount from $14,160 or less to what? He would not have known the answer to that until the end of the year. Also, that same page of the form specifically refers to the other forms that have been addressed here. So for these reasons, respectfully ask this court to reverse the board and order waiver of repayment for Mr. Green. Thank you, Mr. Fitzgerald. I know that your court appointed, and we appreciate very much your undertaking representation of this case. Thank you.
judges: William B. Traxler Jr., Barbara Milano Keenan, Stephanie D. Thacker